TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JERRY C. YANG
Assistant United States Attorney
Chief, Riverside Branch Office
PETER DAHLQUIST (Cal. Bar No. 285548)
Assistant United States Attorney
Riverside Branch Office
    3403 10th Street, Suite 200
    Riverside, California 92501
    Telephone:   (951) 276-6267
    Facsimile:   (951) 276-6202
    E-mail:     Peter.Dahlquist@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>ANUJ MAHENDRABHAI PATEL,<br><br>          Defendant. | ED CR No. 20-162-ODW-1<br><br>**UNITED STATES' POSITION WITH RESPECT TO SENTENCING FACTORS AS TO DEFENDANT ANUJ MAHENDRABHAI PATEL; DECLARATION OF PETER DAHLQUIST; EXHIBITS**<br><br>Hearing Date:   February 22, 2022<br>Hearing Time:   10:00 a.m.<br>Location:       Courtroom of the Hon.<br>                   Otis D. Wright, II |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Peter Dahlquist, hereby files its Position with Respect to Sentencing Factors.

///

///

1    This Sentencing Position is based upon the attached memorandum of points and

2   authorities, the files and records in this case, and such further evidence and argument as

3   the Court may permit.

4    Dated: February 8, 2022                    Respectfully submitted,

5                                               TRACY L. WILKISON
                                                United States Attorney
6
7                                               SCOTT M. GARRINGER
                                                Assistant United States Attorney
8                                               Chief, Criminal Division

9                                               JERRY C. YANG
10                                              Assistant United States Attorney
                                                Chief, Riverside Branch Office
11
12                                               */s/ Peter Dahlquist*
                                                PETER DAHLQUIST
13                                              Assistant United States Attorney

14                                              Attorneys for Plaintiff
15                                              UNITED STATES OF AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

When Anuj Mahendrabhai Patel ("Defendant") became a naturalized citizen in 2015, he swore "to support and defend the laws of the United States of America" and "to bear true faith and allegiance to the same."  *See* 8 U.S.C. § 1448.  Defendant betrayed that oath by conspiring with Indian nationals to exploit the elderly through mass telemarketing scams.  Defendant's crimes against elderly victims are particularly heinous because his victims are almost certainly too old to recover.  What is more, Defendant played a prominent role in this scheme.  Defendant's co-defendants—noncitizens facing mandatory deportation because of their convictions—assumed much of the legal risk of the enterprise by collecting parcels and delivering those parcels to Defendant.  By contrast, Defendant coordinated directly with co-schemers in India, laundered proceeds, and was paid a percentage of the proceeds.  In mitigation, defendant represents through counsel that has already paid $200,000 in restitution, mitigating some of the harm to the identified, surviving victims.  Balancing both seriousness of the offense against Defendant's attempts to make amends and his prompt plea, the United States requests the Court sentence him to 78 months' imprisonment, 3 years of supervised release, restitution in the amount of $490,500, and a $100 special assessment.

## II.   STATEMENT OF FACTS

### A.   Facts Defendant Admitted During Change of Plea

During his change of plea hearing and in the written plea agreement, Defendant admitted that beginning at least as early as April 2019, and continuing through March 6, 2020, in Riverside County, and elsewhere, defendant conspired and agreed with Elmer Miranda Barrios ("E.M.B."), William Margarito Barrios ("W.M.B."), and others, to use the mails and interstate wires to knowingly and with the intent to defraud, devise, participate in, and execute a scheme to defraud elderly victims by means of material false and fraudulent pretenses, representations, and promises and the concealment of

1  material facts.  (ECF No. 65, Plea Agreement ("Plea"), ¶ 12.)  Defendant knew the
2  unlawful purpose of the conspiracy and willfully joined it.  (*Id.*)

3       As part of the scheme, defendant's co-conspirators would call victims and would
4  falsely claim they were government employees or law enforcement officers.  (*Id.*)  Using
5  a number of fraudulent pretenses and representations, defendant's co-conspirators would
6  convince the victims that the victims' identities or assets were in jeopardy.  (*Id.*)  For
7  example, defendant's co-conspirators told some victims that the victims' social security
8  numbers had been linked to crimes and that there were warrants issued by courts
9  authorizing the arrests of the victims.  (*Id.*)  Defendant's co-conspirators told the victims
10  that in order to clear the warrants, they should withdraw their savings and send cash by
11  mail to other co-conspirators.  (*Id.*)

12       Defendant's co-conspirators would generally have victims send the parcels filled
13  with cash through shipping companies that allowed parcel recipients to pick up parcels
14  so long as the recipients had identification matching the names listed on the parcel as the
15  addressees.  (*Id.*)  Defendant used tracking numbers victims provided to his co-
16  conspirators to monitor parcels sent by victims.  (*Id.*)  Defendant would then
17  communicate with parcel couriers, including co-conspirators E.M.B. and W.M.B., who
18  used fraudulent identification documents matching the names listed on the parcels as
19  addressees to retrieve the parcels arriving in Riverside County and elsewhere.  (*Id.*)  The
20  conspiracy was coordinated and managed from outside the United States.  (*Id.*)  As part
21  of the conspiracy, defendant received or intended to receive the following: a parcel from
22  R.W. containing $15,000; a parcel from C.A. containing $11,000; a second parcel from
23  C.A. containing $11,000; a parcel from M.T. containing $19,500; a parcel from D.R.
24  containing $10,000; a parcel from J.L. containing $60,000; a parcel from M.F.
25  containing $106,920; a parcel from P.D. containing $15,000; a parcel from G.M.
26  containing $40,000; a parcel from E.M. containing $49,000 and 98 gift cards; a parcel
27  from W.H. containing $9,000; a parcel from M.S. containing $60,000; a parcel from A.F.
28  containing $45,000; a parcel from T.R. containing $10,000; a parcel from R.G.

containing $30,000; a parcel from G.L. containing $10,000; a second parcel from G.L. containing $10,000; and a parcel from J.S. containing $40,000.  (*Id.*)  This scheme involved at least 10 victims and was committed through mass-marketing.  (*Id.*)  Defendant knew that many of the victims of the scheme were vulnerable victims.  (*Id.*)  Defendant knew the unlawful purpose of the conspiracy and willfully participated.  (*Id.*)

### B.    The Indictment is a Snapshot of a Broader Pattern of Behavior

Defendant admits that his role in this scheme began at least as early as 2019, but earlier, in 2018, AT&T wireless linked Defendant to an IRS phone scam.  AT&T wireless discovered that Defendant's personal telephone with number ending in 0450 was the number that was most frequently registered to the same cell site in Lake Elsinore California as a number that was being used to commit an IRS phone scam.[1]  (Dahlquist Decl., Ex 1.)  The number that was being used to further an IRS phone scam received 3,072 calls during a two-day period, most likely from victims who were calling the number after receiving a bogus voicemail notification that money was owed to the IRS.  (*Id.*)  Those calls from victims responding to bogus IRS voicemails were likely then forwarded to call centers in India where individuals impersonated IRS tax collectors would defraud the calling victims.  (*Id.*)  Cell site records show that, around the same time the IRS scheme was ongoing, the phone used as part of the IRS fraud scheme and Defendant's phone with number ending in 0450 traveled from Lake Elsinore to Hemet, California.  (*Id.*)  Call detail records also show that the phone used as part of the IRS fraud scheme and Defendant's phone number ending in 0450 called other common numbers.  (*Id.*)

While it is impossible to be sure how long Defendant has been engaged in preying on the elderly, the AT&T wireless investigation shows that this case is just a snapshot in time of Defendant's overall conduct.  Investigators only began investigating this scheme

---

[1] The number identified in the AT&T report ending in 0450 is the same number investigators identified as one of the numbers Defendant used during this investigation. (ECF No. 15, Request for Det'n of Defendant at 27.)

3

because so many victims were sending parcels to the Riverside area that eventually law enforcement authorities identified Defendant as the hub of a courier cell.  Under the circumstances, it is impossible determine how much of Defendant's million dollars in net worth is derived from scamming the elderly.[2]

## III.    SENTENCING GUIDELINES CALCULATIONS

### A.    United States Guidelines Calculation

Based on the analysis below that an aggravating role enhancement applies, the United States calculates the total offense level to be 29 and a Criminal History Category of I.  The United States offense level calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level: | 7 | USSG § 2B1.1(a)(1) |
| Loss Amount More than $550,000: | +14 | USSG § 2B1.1(b)(1)(H) |
| 10 or More Victims: | +2 | USSG § 2B1.1(b)(2)(A)(i) |
| Misrepresentation of Work on Behalf of Government Agency: | +2 | USSG § 2B1.1(b)(9)(A) |
| Substantial Part of Scheme Outside the United States: | +2 | USSG § 2B1.1(b)(10)(B) |
| Vulnerable Victims: | +2 | USSG § 3A1.1(b)(1) |
| Manager or Supervisor of Criminal Activity Involving Five or More Participants: | +3 | USSG § 3B1.1(b) |
| Acceptance of Responsibility: | -3 | USSG § 3E1.1(a), (b) |

[2] The PSR estimates Defendant's net worth after all liabilities to be $903,296.06. (PSR ¶ 103.)  That estimate appears to be based on Defendant's own conservative estimation of his assets.  For example, Defendant estimates the value of his home to be $550,000 based on information from Zillow.  However, as of February 3, 2022, Zillow estimates the value of the home to be $665,200.  (Dahlquist Decl., Ex. 5.)  Even with that modification alone, at the relatively young age of 31, Defendant's net worth would be well over a million dollars.

4

| | |
|---|---|
| **Total:** | **29** |

The resulting Guidelines range based on an offense level of 29 within Criminal History Category I is 87 to 108 months' imprisonment.  *See* USSG Ch. 5 Pt. A.[3]  The probation officer recommends a sentence of 87 months imprisonment.  (ECF No. 142, Prob. Recomm. Ltr., at 3.)

### B. Defendant Merits Aggravating Role Enhancement as Manager of Couriers Who Exercised Responsibility Over Scheme Proceeds

#### 1.   Legal Standard for Manager or Supervisor under §§ 3B1.1(b), (c)

Aggravating role adjustments under § 3B1.1 apply to organizers, leaders, managers, or supervisors.  The burden to show that a defendant has one of these roles is a preponderance of the evidence.  *United States v. Rivera,* 517 F. App'x 60, 61 (9th Cir. 2013).  Circuit courts define "manager" and "supervisor" "quite liberally."  *See, e.g., United States v. Lopez*, 431 F.3d 313, 318 (8th Cir. 2005).  To receive this enhancement, it is sufficient to show that "defendant [1] exercised some control over others involved in the commission of the offense *or* [2] was responsible for organizing others for the purpose of carrying out the crimes."  *United States v. Ingham*, 486 F.3d 1068, 1074 (9th Cir. 2007) (emphasis in original) (citation omitted).  Also, an "upward departure may be warranted . . . in the case of a defendant who exercised management responsibility over the property, assets, or activities of a criminal organization."  USSG § 3B1.1, cmt. n.2.  If a defendant was (1) a manager or supervisor and (2) the criminal activity involved five or more participants, a three-level enhancement applies.  USSG § 3B1.1(b).  Of note, it is not required that a defendant manage or supervise five subordinates for the three-level enhancement to apply; what is required is the activity involve five or more participants.

---

[3] The Probation Officer has summarized some of the evidence that would support an aggravating-role enhancement under USSG § 3B1.1, but has not applied that enhancement in the initial calculations.  The Probation Officer therefore calculates the offense level as 26.  (PSR ¶¶ 43-65.)  Based on the Probation Officer's calculations, the resulting Guidelines range based on an offense level of 26 within Criminal History Category I is 63 to 78 months' imprisonment.  *See* USSG Ch. 5 Pt. A.

2.    <u>Defendant Was a Manager or Supervisor and Controlled Proceeds</u>

Defendant "managed or supervised" couriers.  *See* USSG § 3B1.1(b).  Defendant coordinated with co-schemers in India and managed the scheme in the United States. Defendant communicated directly with the scheme organizers in India to gather parcel tracking information and communicate about aliases couriers would use.  (ECF No. 15, Request for Det'n of Defendant at 21; Plea ¶ 12.)  Defendant even showed the investigating agents how he would communicate with co-schemers in India using WhatsApp to coordinate where parcels would be delivered.  (*Id.*)  Defendant then used the tracking numbers victims provided to his Indian co-schemers to monitor the parcels the victims sent and would then communicate with the parcel couriers who then delivered those parcels to Defendant.  (*See* Plea ¶ 12.)  The couriers would retrieve the parcels using false identification documents matching the names listed on the parcels as addressees and deliver the parcels directly to Defendant.  (*Id.*)  The admissions that Defendant coordinated with co-conspirators in India and managed local couriers is further supported by the evidence found during the execution of a search warrant at Defendant's liquor store.  When officers searched Defendant's liquor store, in addition to opened parcels sent by victims (confirming parcels were delivered to Defendant and opened by Defendant), officers recovered three fake Arizona driver's licenses bearing one of the couriers' image but in three different false names.  (ECF No. 15, Request for Det'n of Defendant at 5, 24.)  Defendant's possession of fake identification documents confirms that he supervised the couriers and coordinated between the call centers and the couriers about what aliases were being used.  At bottom, Defendant was the manager of the scheme's operations in the United States.  He directed the couriers and the couriers reported back to him and delivered parcels directly to him.  As such, he was a manager or supervisor under the Guidelines.

Defendant was also a manager because he "exercised management responsibility over the" proceeds of the scheme.  USSG § 3B1.1, cmt. n.2.  Defendant admitted that he (1) opened the parcels, (2) was paid on commission, and (3) made $20,000 from the

scam during a four-month period. (ECF No. 15, Request for Det'n of Defendant at 22-23.) He further admitted that one of his responsibilities was to convert proceeds from "black to white," or to launder the proceeds of the scheme. (*Id.* at 22.) Three different couriers, by contrast, all reported being paid a nominal fee for delivering parcels. (Dahlquist Decl., Exs. 2 & 3.) By opening parcels, keeping a prorated share of the proceeds, and then by laundering the proceeds, Defendant "exercised management responsibility over the property, assets or activities of a criminal organization" and he qualifies for an enhancement as a manager or supervisor. *See* USSG § 3B1.1, cmt. n.2.

### 3. The Scheme Involved Five or More Participants

The Defendant managed or supervised others as part of a criminal scheme that "involved five or more participants." *See* USSG § 3B1.1(b). This scheme involved well over five participants:

- Elmer Miranda Barrios: This participant was convicted for his role as a courier in the scheme. Defendant admitted in his plea agreement to communicating with this participant during the conspiracy and admitted to receiving or intending to receive parcels this participant collected. (Plea ¶ 12.)

- William Margarito Barrios: This participant was convicted for his role as a courier in the scheme. Defendant admitted in his plea agreement to communicating with this participant during the conspiracy and admitted to receiving or intending to receive parcels this participant collected. (Plea ¶ 12.)

- Co-Conspirator-A: This participant is identified in Overt Acts 17-18 of the Indictment as a courier who delivered parcels to Defendant. Defendant identified this participant during an interview as "José." (ECF No. 15, Request for Det'n of Defendant at 21.)

- Co-Conspirator-B: This participant is identified in Overt Acts 20-22 of the Indictment as a courier who delivered parcels to Defendant. Defendant

7

identified this participant during an interview as "Megan."  (ECF No. 15, Request for Det'n of Defendant at 21.)

- Co-Conspirators in Call Centers in India: The victims received telephone calls from co-conspirators who induced victims to send parcels to Defendant and his co-conspirators.
- Co-Conspirators Coordinating Between Call Centers and Defendant: Defendant stated during an interview that the scheme was managed in India by his old friend "Jay."  Defendant exchanged messages with "Jay" during an interview with investigators.  (*Id.* at 23.)

Accordingly, Defendant was (1) a manager or supervisor of (2) criminal activity that involved five or more participants.  As such, a three-level enhancement applies.  *See* USSG § 3B1.1(b).

### C.     United States Restitution Calculation

The United States requests that the Court order restitution in the amount of $490,500 to be paid to the victims identified in the Probation Officer's recommendation. The United States total restitution amount is lower than the Probation Officer's recommendation because the United States is not requesting restitution on behalf of victims E.M. and M.P. because those loss amounts were recovered during the investigation.

## IV.    UNITED STATES' RECOMMENDED SENTENCE: 78 MONTHS OF IMPRISONMENT AND 3 YEARS OF SUPERVISED RELEASE

The Sentencing Guidelines are the "starting point and the initial benchmark" for sentencing. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  After calculating the Guidelines range, the Court must consider "the nature and circumstances of the offense," and "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1). The Court should then consider the need for the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence, protect the public, and to rehabilitate Defendant.  18 U.S.C. § 3553(a)(2).  The Court should impose a sentence

that is sufficient, but not greater than necessary, to satisfy these statutorily prescribed sentencing objectives.  18 U.S.C. § 3553(a).

A 78-month sentence is appropriate based on the serious nature of the offense, Defendant's knowledge of the scheme, his leadership role in furthering the scheme, and the profits he made from the scheme based on his leadership role.  Considering the serious nature of Defendant's crime, "elder abuse involves the exploitation of potentially vulnerable individuals with devastating physical, mental, emotional, and financial consequences to the victims and their loved ones[.]"  Elder Abuse Prevention Act of 2017, Pub. L. No. 115-70, § 301, 131 Stat. 1212 (2017).  Most elder fraud cases go unreported, but no less than $2,900,000,000 is stolen from elderly victims each year through financial abuse and exploitation. *Id.*  "Up to half of older adults with dementia will experience abuse" and "[o]lder adults who are abused are 3 times more likely to die earlier than older adults of the same age who are not abused." *Id.*  In this case, Defendant and his co-schemers exploited their victims' patriotic instincts by feigning they were acting with law enforcement authority, or even in some instances, with the authority of the United States District Court.  (*See* Dahlquist Decl., Ex. 4.)  As outlined in the PSR, the impact of Defendant's conduct had a devastating impact on the known victims.  (PSR ¶¶ 25-37.)  Many of the victims, who live on fixed incomes, lost their life savings to Defendant and his co-schemers.  (PSR ¶¶ 27, 30, 33, 34-37.)  Some of the victims, like victims in many elder fraud cases, were especially vulnerable because they suffer from dementia or memory loss.  (PSR ¶ 28-29, 37.)  As a result of the scheme, one 77-year-old victim who sent $60,000 to Defendant, could no longer afford a condominium and was forced to sell it and move in with family.  (PSR ¶ 37.)  The loss of hard-earned financial security took an emotional toll on the victim and the victim's family.  (*Id.*)  Ultimately, that victim passed away after being robbed of dignity that comes from the financial self-reliance that the victim had earned.  (*See id.*)

As the facts of this case demonstrate, elder fraud crimes are particularly heinous.  Not only do the fraudsters exploit the trust and vulnerability of the elderly, but because

of victims' stage in life, they do not have the opportunity to recover from the financial loss. Most of the victims in this case have entered what should be their "golden years," having sacrificed to save for their retirement. But instead, they were duped out of their hard-earned savings by the conspiracy that Defendant helped manage. The seriousness of this scheme and its devastating impact outlined in the PSR cannot be overstated. (PSR ¶¶ 25-37.) What is more, unlike the couriers charged as co-defendants who were paid nominal fees while assuming most of the legal risk by collecting parcels, Defendant was entrusted to manage the proceeds of the scheme and kept a percentage of the profits. His profits ballooned with each additional victim that suffered financial ruin.

Also, the collateral consequences that defendant will face in this case will be less grave than the co-defendant couriers that he managed. The couriers face almost certain deportation after being convicted of felony crimes. Defendant, however, is insulated from those consequences because he became a naturalized citizen in 2015, just three years before AT&T identified his phone number as a number connected with telemarketing scams and four years before this scheme was discovered by law enforcement authorities. Given Defendant's significantly more prominent role in this scheme, as well as his profit from the scheme, he should receive a significantly greater sentence than his co-defendants in this case. Moreover, those co-defendants face serious immigration consequences that will not attach to defendant. Considering all of the applicable 3553(a) factors, including Defendant's payment of restitution and his decision to sign a plea agreement early in the case, a custodial sentence of 78 months is necessary to reflect the seriousness of defendant's offense, in particular considering how he exploited elderly victims.

## V.   CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court sentence Defendant to 78 months' imprisonment, a 3-year term of supervised release, $100 special assessment, and restitution in the amount of $490,500.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF PETER DAHLQUIST

I, Peter Dahlquist, declare as follows:

1.      I am an Assistant United States Attorney in the Central District of California and I am currently assigned to the above-captioned matter.

2.      Attached as Exhibit 1 is a true and correct, redacted, highlighted AT&T Global Fraud Management Organization Report summarizing information learned about an IRS impersonation fraud scheme.

3.      Attached as Exhibit 2 is a true and correct, redacted, highlighted Treasury Inspector General for Tax Administration Memorandum of Interview.

4.      Attached as Exhibit 3 is a true and correct, redacted, highlighted Homeland Security Investigations Report of Investigation.

5.      Attached as Exhibit 4 are redacted documents that a schemer sent to a victim to perpetuate false representations that the schemer was a government agent and that the United States District Court had issued a warrant for the victim's arrest.

6.      Attached as Exhibit 5 is a true and correct, redacted copy of a Zillow estimate for Defendant's residence as identified in the PSR.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Riverside, California, on February 8, 2022.

_____

PETER DAHLQUIST